**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VENIAMIN VULPE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   20-cv-6074** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                  **February 10, 2022**

Veniamin Vulpe (Plaintiff) filed this action pursuant to 42 U.S.C. § 405(g) seeking review of the Commissioner of the Social Security Administration's decision denying his claim for Supplemental Security Income (SSI) under Title II of the Social Security Act.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's request for review is **DENIED**.


I.      **PROCEDURAL HISTORY**

Plaintiff protectively filed an application for SSI on July 22, 2018.  (R. 12, 136).  Plaintiff alleged disability beginning January 16, 2017 due to eye problems, amputation below the left knee, and amputation of half the right foot.  (R. 158).  Plaintiff's application was initially denied on November 2, 2018, and he requested a hearing from an Administrative Law Judge (ALJ), which occurred on January 22, 2020.  (R. 12).  Plaintiff, represented by an attorney, appeared and testified at the hearing, as did an impartial vocational expert (VE).  (R. 31–54).  On February 18, 2020, the ALJ issued a decision denying benefits under the Act.  (R. 9–30).  Plaintiff

requested review of the decision, and the Appeals Council denied his request on October 21, 2020, making the ALJ's decision the final decision of the Commissioner.  (R. 1–6).

Plaintiff filed a complaint in this Court on December 2, 2020.  (Compl., ECF No. 1).  On December 16, 2020, the parties consented to my jurisdiction in this matter.  (ECF No. 4).  After two extensions of time, the Commissioner filed an answer to Plaintiff's complaint on May 26, 2021.  (ECF No. 9).  On July 30, 2021, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 10).  The Commissioner filed a Response (Resp., ECF No. 11) on August 30, 2021, and Plaintiff filed a Reply on September 8, 2021 (Reply, ECF No. 12).

## II.    FACTUAL BACKGROUND

The Court has reviewed the administrative record in its entirety, and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on July 22, 2000, making him sixteen years old as of the alleged onset date of January 16, 2017.  (R. 17).  On July 21, 2018, Plaintiff attained age eighteen, which placed him in the category of a younger individual, age eighteen to forty-four.  (R. 25).  Plaintiff has at least a high school education and has no history of past relevant work.  (R. 25, 38).

On January 16, 2017, Plaintiff sustained injuries after falling from a train and grabbing onto a high voltage electrical wire.  (R. 226).  He alleges disability due to the amputation of his right leg below the knee and of half of his left foot,[1] burns to his left arm, and eye problems resulting from the burns.  (R. 158).

---

[1]  The initial disability application incorrectly lists Plaintiff's amputations as below the left knee and half the right foot.  (R. 158).

### A.   Medical Evidence

On January 16, 2017, Plaintiff was admitted to St. Christopher's Hospital for Children. (R. 226).  On admission, he exhibited second degree electrical burns to the face, anterior neck, anterior trunk, left shoulder, and left hand, third degree burns to his bilateral feet, lacerations to the scalp and forehead, and skeletal injuries.  *Id.*  Plaintiff also suffered a fracture of the T6 vertebrae.  (R. 230).  He was hospitalized in the ICU for over two weeks, during which time he underwent multiple debridements and skin grafting.  (R. 226–261, 282–88, 291–93, 296–300). Plaintiff also underwent a right below-the-knee amputation and a left foot amputation at the Lisfranc joint.  (R. 258, 289–90).

On February 2, 2017, Plaintiff was discharged from St. Christopher's and transferred to Shriners Hospital for Children for rehabilitative care.  (R. 385, 389).  Plaintiff underwent inpatient therapy and rehabilitation with Shriners until he was discharged to his home in March 2017, then continued receiving outpatient therapy through roughly April 2017.  (R. 19, 2010). On March 3, 2017, Plaintiff underwent a CT scan of his thoracic spine, which showed anterior wedging deformity at T6 with 20-25% height loss anteriorly and multilevel chronic endplate deformities and irregularities in the mid and lower thoracic spine.  (R. 991).  On May 30, 2017, Plaintiff was examined by Brooke A. Burkey of St. Christopher's Pediatric Associates for a follow-up to plastic surgery, and he reported feeling no pain, no longer taking pain medication, that his activity was back to pre-operative levels, and that he was doing well at home and his status had improved.  (R. 1915).  Plaintiff was hospitalized in June 2017 for a fungal infection at the amputation site, and again in August 2017 for a skin infection.  (R. 1039–41, 1389, 1459).  In June 2017, Plaintiff was fitted for permanent prostheses.  (R. 2210, 2241).

In December 2017, Plaintiff was discharged from Shriners occupational therapy (OT) treatment.  (R. 2022).  Progress notes stated that he had demonstrated significant improvement in his right-hand range of motion, strength, and sensibility, recovery in his ulnar and median nerve injuries, and continually increasing strength.  *Id.*  He was able to complete activities of daily living (ADLs), met therapy goals, and had recently completed a woodworking project with minimal assistance.  *Id.*  Plaintiff was able to walk one-hundred feet without forearm crutches in a six-minute walking test, and stated that he planned on going to a local gym to train over the next several weeks.  (R. 2025).

Plaintiff continued visiting Shriners on an outpatient basis throughout 2018.  (R. 2170–2497).  On February 1, 2018, Dr. Bethany Lipa noted that Plaintiff was doing well overall, tolerating his bilateral prostheses, and using either one or no forearm crutch depending on the walking surface.  (R. 2190).  Plaintiff's vision was much improved, he was able to ambulate well without crutches, and his L ankle clonus was not impairing his mobility or balance.  (R. 2191).  He stated that he was enrolled in five cyber school classes and planned to graduate in 2018.  *Id.*  The next day, Plaintiff reported that his spasticity had improved, and that he could walk approximately forty-five minutes in his prostheses without difficulty.  (R. 2188).  On June 12, 2018, Plaintiff reported intermittent pain in his left lateral foot and right posterior fibula, but also noted that he was ambulating well independently and playing volleyball, basketball, and piano.  (R. 2177–78).  He also stated that he had attended a church sleep-away camp and was not considering further surgery.  (R. 2179).  On examination Plaintiff demonstrated improvement in his left upper extremity strength and reported that his left hand strength was now similar to his right, although he still had impaired sensation in the left median nerve distribution.  (R. 2178).

Dr. Lipa stated that Plaintiff would soon start the process of transition to adult care, specifically naming the Moss Rehabilitation Amputee program.  (R. 2179).

On August 8, 2018, after Plaintiff turned eighteen, he visited Shriners for a follow-up examination for his thoracic fracture.  (R. 2173).  Dr. Joshua Pahys noted that Plaintiff was no longer using bracing for his spine and that he was doing well, with no back pain, numbness, or tingling.  *Id.*  Plaintiff reported using a bicycle, and stated that he had no complaints at that time. *Id.*  Upon examination, his shoulders were even, his bilateral lower extremities were five out of five, and his sensation was intact.  *Id.*  X-rays showed an improving thoracic kyphosis to within normal range.  *Id.*

### 1.      State Agency Reviewing Physician Dr. Parmelee

On October 19, 2018, Dr. Toni Jo Parmelee reviewed the medical file and conducted a medical evaluation of Plaintiff's impairments.  (R. 60–66).  Regarding Plaintiff's impairments before he turned eighteen, Dr. Parmelee found that Plaintiff's amputations, burns, joint disfunction, and fractures of the vertebral column with spinal cord lesion constituted severe impairments, but did not meet, medically equal, or functionally equal the relevant listings.  (R. 60).  Dr. Parmelee found that Plaintiff had no limitation in acquiring and using information, attending and completing tasks, and interacting and relating with others.  (R. 61).  She also found that Plaintiff had a less than marked limitation in moving about and manipulating objects, caring for himself, and in his health and physical well-being.  *Id*.  Dr. Parmelee noted that Plaintiff "[a]mbulates well, independently," and that he plays volleyball and basketball.  (R. 62).  Dr. Parmelee found that Plaintiff's impairments were not of such severity to cause marked or severe functional limitations in Plaintiff's functioning.  *Id.*

Regarding Plaintiff's impairments after he turned eighteen, Dr. Parmelee found that Plaintiff suffered the severe impairments of amputations, factures of the vertebral column with spinal cord lesion, cataracts, and late effects of injuries to the nervous system. *Id.* She found that Plaintiff's impairments could reasonably be expected to produce his pain or other symptoms, but that his statements about the intensity, persistence, and functionally limiting effects of the symptoms were partially consistent with the medical and non-medical evidence in the record. (R. 63).

Regarding Plaintiff's functional limitations, Dr. Parmelee found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for two hours with normal breaks, sit for a total of six hours in an eight-hour workday, and that his ability to push and/or pull was limited in both lower extremities. (R. 63–64). Dr. Parmelee found that Plaintiff could occasionally climb ramps or stairs, balance, stoop, or crouch, and that he could never climb ladders, ropes, or scaffolds, kneel, or crawl. (R. 64). She found that Plaintiff had unlimited ability to reach in any direction and feel, and limited ability to handle and finger on his left side. (R. 65). Dr. Parmelee found that Plaintiff could have unlimited exposure to wetness and noise, but should avoid concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery or heights. (R. 65–66).

### 2.    Consultative Orthopedic Examiner Dr. Woll

On October 2, 2019, after Plaintiff attained age eighteen, Dr. Andrea Woll, D.O., conducted a consultative orthopedic examination of Plaintiff. (R. 2511–15). Dr. Woll noted that Plaintiff's activities of daily living included occasionally cooking, cleaning, doing laundry, shopping, and watching TV. (R. 2512). On physical examination, Plaintiff's gait was abnormal,

he could not walk on heels or toes, but he could squat using the examination table, and he used no assistive device to walk. (R. 2513). His hand and finger dexterity were intact, his grip strength was 5/5 bilaterally, and he could zip, button, and tie. *Id.* Dr. Woll noted that Plaintiff had two three-by-three-centimeter skin grafts, one on his neck and one over his left AC joint; Plaintiff did not display any cervical or paracervical pain or spasm, and his joints in his upper extremities were stable and nontender. (R. 2513–14). As to his lower extremities, Plaintiff had no brawny edema, no varicosities, no open wounds, and no ulcerations. (R. 2514). His joints were stable and nontender, and the stumps of his amputations had both healed well. *Id.* Dr. Woll diagnosed Plaintiff with status post electrical burn with amputation of right lower extremity below the knee; delayed wound healing with status post wound vac and skin grafts; partial traumatic amputation of left foot; open would of ankle which has closed; and cataract of eyes secondary to electrical burn, status post cataracts removal. *Id.*

Dr. Woll also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (R. 2516–21). In this evaluation, Dr. Woll found that Plaintiff could continuously lift and/or carry up to twenty pounds. (R. 2516). She found that Plaintiff could sit for four hours, stand for one hour, and walk for one hour at one time without interruption, and that he could sit for six hours, stand for four hours, and walk for four hours total in an eight-hour workday. (R. 2517). Dr. Woll noted that Plaintiff used prosthetics, but found that he did not require the use of a cane to ambulate, and that a cane was not medically necessary. *Id.* Regarding Plaintiff's use of his hands, Dr. Woll found no limitations. (R. 2518). Regarding the use of his feet, Dr. Woll found Plaintiff could never operate foot controls with his right foot, and could occasionally operate foot controls with his left. *Id.* Dr. Woll found that Plaintiff could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, and that he could

never climb ladders or scaffolds.  (R. 2519).  She found that Plaintiff could be frequently

exposed to dust, odors, fumes, extreme heat, and vibrations, could occasionally be exposed to

moving mechanical parts, operating a motor vehicle, humidity and wetness, and extreme cold,

and could never be exposed to unprotected heights.  (R. 2520).  Dr. Woll found Plaintiff could

perform activities like shopping, travel without a companion, ambulate without using a

wheelchair or other aids, use standard public transportation, climb a few steps at a reasonable

pace, prepare a simple meal and feed himself, care for his personal hygiene, and sort, handle, or

use paper or files.  (R. 2521).  She also found that Plaintiff could not walk a block at a reasonable

pace on rough or uneven surfaces.  *Id.*

### 3.    Treating Physician Dr. Perelshteyn

On January 17, 2020, Plaintiff's primary care physician, Dr. Vladimir Perelshteyn,

completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical)

concerning Plaintiff's limitations.  (R. 2524–29).  Dr. Perelshteyn found that Plaintiff could

frequently lift or carry up to ten pounds.  (R. 2524).  He found that Plaintiff could sit for up to

eight hours without interruption, but could only stand or walk for up to ten or fifteen minutes.

(R. 2525).  He noted that Plaintiff did not require the use of a cane to ambulate.  *Id.*  Dr.

Perelshteyn found that Plaintiff had no restrictions in the use of his right hand, but could only

frequently reach, handle, finger, or push/pull with his left hand.  (R. 2526).  He found that

Plaintiff could never operate foot controls with either his left or right foot.  *Id.*  Dr. Perelshteyn

found that Plaintiff could frequently stoop, occasionally climb stairs, balance, or kneel, and never

climb ladders or scaffolds, crouch, or crawl.  (R. 2527).  He found that Plaintiff could be

continuously exposed to dust, odors, and other pulmonary irritants; could occasionally operate a

motor vehicle and be exposed to humidity, extreme cold, and extreme heat; and could never be

exposed to unprotected heights, moving mechanical parts, or vibrations.  (R. 2528).  Dr.

Perelshteyn found that Plaintiff could not perform activities like shopping; travel without a

companion; ambulate without using a wheelchair, walker, two canes, or two crutches; walk a

block at a reasonable pace on rough or uneven surfaces; use standard public transportation; or

prepare a simple meal and feed himself.  (R. 2529).  He found that Plaintiff could climb a few

steps at a reasonable pace with the use of a single handrail; care for his personal hygiene; and

sort, handle, or use paper or files.  *Id.*  He also stated that "Patient cannot walk a block."  *Id.*

### B.  Non-Medical Evidence

The record also contains non-medical evidence.  On August 14, 2018, Raisa Vulpe

completed an Adult Function Report on Plaintiff's behalf.  (R. 173–81).  Plaintiff reported that

he would not be able to lift more than twenty pounds, squat, kneel, stand for more than ten

minutes, walk for more than thirty minutes, or climb stairs for more than three floors.  (R. 174).

He reported that he could only see with lenses, and that his left hand was weaker than his right.

*Id.*  Plaintiff reported that in an average day he would wake up, put in his contact lenses, put on

his prosthetics, dress, attend school from home, go outside, and do chores before going to bed.

(R. 175, 181).  He reported some difficulty dressing and bathing due to his prosthetics.  (R. 175).

Plaintiff reported that he could prepare his own meals and do chores such as cleaning, laundry,

and household repairs.  (R. 176).  He stated that he went outside daily, and could walk, ride in a

car, or ride a bicycle, but could not drive because he was waiting for his permit.  (R. 177).  He

reported that he could shop for his own snacks.  *Id.*  Plaintiff's stated hobbies included playing

sports, video games, and biking, although he reported that playing sports was much more

difficult due to his impairments.  (R. 178).  He reported engaging in weekly social activities such

as attending church, going to the park, and going to friends' houses.  *Id.*

Plaintiff also testified at the administrative hearing.  (R. 31–54).  Plaintiff testified that he lived in an apartment with his mother, father, and sister, and that he had a driver's license and was able to drive using his left foot.  (R. 37–38, 45–46).  He testified that he graduated from high school in 2019, and that at the time of the hearing he was studying computer science full-time at community college.  (R. 38–39).  Plaintiff testified that he could walk on flat pavement for about ten minutes at a time, and up to half an hour with rests.  (R. 41).  He testified that he was forced to use a wheelchair while on a 2018 trip to Spain with his family because there were a lot of hills and he became tired quickly.  *Id.*  He also testified that he traveled to Canada in 2019 but stayed inside most of the time.  (R. 42).  Plaintiff testified that he was unable to squat, kneel, bend at the knee, or climb ladders, and that after ten to fifteen minutes of walking his left leg would hurt and begin to shake.  (R. 42–43).  Plaintiff testified that he could not walk on an uneven surface.  (R. 43).  He also testified that he could stand for up to ten minutes at a time before needing a break.  (R. 44).  Plaintiff testified that his injuries caused him to lose his sense of touch in his left arm, and that he could only lift up to ten pounds.  (R. 45).  Plaintiff testified that he did not use any assistive devices such as a crutch or cane, but that he used a scooter to go shopping.  (R. 47–48).  He testified that he had used a wheelchair twice in the past three years.  (R. 48).

## III.   LEGAL STANDARD

### A.   Child Standard

Under the Social Security Act, the SSA must apply a three-step sequential evaluation process to determine if a child under the age of eighteen is disabled.  20 C.F.R. § 416.924(a).  A child under eighteen is eligible for SSI benefits only if: (1) he is not performing substantial gainful activity; (2) he has a medically determinable impairment or combination of impairments

that is severe; and (3) the impairment or combination of impairments meets, medically equals, or functionally equals the severity of one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.924.

If the child's impairment does not medically meet a listing, the examiner must determine whether the impairment functionally equals a listing.  An impairment of combination of impairments functionally equals a listed impairment if it causes a "marked" limitation in two of six domains of functioning or an "extreme" limitation in one of those six domains.  20 C.F.R. § 416.926(a). [2]  The six domains are:  (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

**B.    Adult Standard**

To be eligible for Social Security benefits under the Act, an adult claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the

---

[2]  A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).

impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work.  If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 404.1520.  The claimant bears the burden of establishing steps one through four, and then the burden shifts to the Commissioner at step five to establish that the claimant is capable of performing other jobs in the national economy, in light of his age, education, work experience and residual functional capacity.[3]  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.  *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

---

[3]  Residual functional capacity ("RFC") is defined as "that which an individual is still able to do despite the limitations caused by [his impairments]."  20 C.F.R. § 404.1545(a); *see also Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001).

**IV.   ALJ'S DECISION**

In her decision, the ALJ used the three-step sequential analysis for the period Plaintiff was under eighteen years old and the five-step sequential analysis for the period Plaintiff was eighteen years old or older, and made the following findings:

1.     The claimant was born on July 22, 2000 and was, therefore, an adolescent on July 22, 2018, the application date.  The claimant attained age 18 on July 21, 2018.[4]

2.     The claimant has not engaged in substantial gainful activity since July 22, 2018, the application date.

3.     Prior to attaining age 18, the claimant had the following severe impairments: amputation of the left foot and right lower extremity below the knee; burns/electrocution injuries to the left upper extremity.

4.     Prior to attaining age 18, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.     Prior to attaining age 18, the claimant did not have an impairment or combination of impairments that functionally equaled the severity of the listings.

6.     Because the claimant did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, the claimant was not disabled prior to attaining age 18.

7.     The claimant has not developed any new impairment or impairments since attaining age 18.

---

[4]  Under the Social Security regulations, a person attains a given age on the day before his corresponding birthday.  20 C.F.R. § 404.2(c)(4).

8.     Since attaining age 18, the claimant has continued to have a severe impairment or combination of impairments.

9.     Since attaining age 18, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

10.    After careful consideration of the entire record, I find that, since attaining age 18, the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 416.967(a) with the following limitations: no use of foot controls; frequently able to reach, handle, finger, feel and push/pull with the non-dominant left upper extremity; no climbing of ladders, ropes, or scaffolds, crawling, kneeling, or crouching, and no balancing on narrow, slippery, or erratically moving surfaces; occasional ability to perform all other postural maneuvers; can stand/walk up to two (2) hours/day but only up to 10 minutes at one time; no exposure to vibration or hazards such as unprotected heights or dangerous machinery; and can only tolerate occasional exposure to humidity or extreme temperatures.

11.    The claimant has no past relevant work.

12.    The claimant was born on July 22, 2000 and attained age 18 on 7/21/2018.  He became a younger individual age 18-44 on the date of attainment of age 18.

13.    The claimant has a limited education and is able to communicate in English.

14.    Transferability of job skills is not an issue because the claimant does not have past relevant work.

15.     Since the date the claimant attained age 18, considering the claimant's age,
education, work experience, and residual functional capacity, there are jobs that
exist in significant numbers in the national economy that the claimant can
perform.

16.     The claimant has not been disabled, as defined in the Social Security Act, since
July 22, 2018, the date the application was filed, through the date of this decision.

(R. 17–26).

Accordingly, the ALJ determined Plaintiff was not disabled before or after attaining age
eighteen.  (R. 26).


V.     **DISCUSSION**

In his request for review, Plaintiff raises three claims: (1) the ALJ erred by finding
Plaintiff did not meet a listing as a minor or as an adult; (2) the ALJ erred by failing to assign the
appropriate weight to the opinion of Plaintiff's treating physician; and (3) the ALJ erred by
accepting the VE's testimony that there was work Plaintiff could perform in the national
economy.  (Pl.'s Br., ECF No. 10, at 5, 9, 10).  I will consider each of Plaintiff's arguments in
turn.

A.     **Listings**

First, Plaintiff argues that the ALJ erred by failing to find that he satisfied any of the
listings as a minor or as an adult.  Plaintiff asserts that he satisfies "Listing 101.00B2b" and
"Listing 1.00B2b" because his impairments render him unable to ambulate effectively.  (Pl.'s
Br., ECF No. 10, at 5, 8).  Plaintiff also argues that the ALJ failed to satisfactorily discuss his
ability to ambulate in her listings analysis.  *Id.* at 6–7.

At step three of the disability analysis, the ALJ analyzes whether a claimant's impairments or combination of impairments meet or medically equal one of the listings. For minors, the listings encompass impairments causing marked and/or severe functional limitations; for adults, they describe impairments severe enough to prevent an individual from doing any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 416.925(a). For minors who do not meet or medically equal a listing, the ALJ also analyzes whether the impairment or combination of impairments functionally equals the severity of the listing. 20 C.F.R. § 416.926a. The listing inquiry serves to identify those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background, making further inquiry unnecessary. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). The claimant bears the burden of establishing that his impairments meet or medically equal a listing. 20 C.F.R. §§ 404.1525, 416.925; *Sullivan*, 493 U.S. at 531. To meet this burden, the claimant must establish all the requirements of the relevant listing. *Sullivan*, 493 U.S. at 530 (claimant who meets only some of the listing requirements, "no matter how severely, does not qualify."). Meeting a listing cannot be based on diagnoses alone. 20 C.F.R. § 416.925(d). The listings are strictly construed against claimants because meeting a listing results in an automatic finding of disability. *See Sullivan*, 493 U.S. at 530-32.

### 1.    Minor Listings

Here, the ALJ first considered whether Plaintiff's impairments prior to attaining age eighteen met, or medically or functionally equaled, the criteria for Listings 101.03 (Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), 101.04 (Disorders of the spine), 101.05 (Amputation due to any cause), and 101.08 (Soft tissue injury, e.g., burns). (R. 17–18). Listing 101.05 in particular provides in relevant part:

16

> B.  One or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 101.00B2b, which have lasted or are expected to last for at least 12 months.

20 C.F.R. pt. 404, subpt. P, app. 1, § 101.05(B).  The ALJ found that any ambulatory dysfunction related to Plaintiff's amputations would not be attributable to stump complications resulting in medical inability to use a prosthetic device, as Plaintiff currently uses two prosthetic devices.  (R. 17).  The ALJ also found that the other listings did not apply because any ambulatory dysfunction was not related to reconstructive surgery of a major weight-bearing joint or Plaintiff's thoracic spinal issues, and because the treatment of Plaintiff's burns has not been directed towards the salvage or restoration of a major function.  *Id.*

Finding that Plaintiff did not meet or medically equal a listing as a minor, the ALJ next analyzed whether Plaintiff's impairments or combination of impairments functionally equaled the listings.  As part of this analysis, the ALJ must consider how the claimant functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  To functionally equal the listings, the claimant's impairment must result in marked limitations in two domains or an extreme limitation in one domain; a marked limitation interferes seriously with a claimant's ability to independently initiate, sustain, or complete activities, and an extreme limitation interferes very seriously with these same abilities.  20 C.F.R. § 416.926a(d) & (e).  In making this assessment, the ALJ must compare how appropriately, effectively, and independently the claimant performs activities to the performance of other children of the same age who do not have impairments.  20 C.F.R. § 416.926a(f).

Here, the ALJ found that Plaintiff had: (1) no limitation in acquiring and using information; (2) no limitation in attending and completing tasks; (3) no limitation in interacting and relating with others; (4) a marked limitation in moving about and manipulating objects; (5) less than a marked limitation in the ability to care for himself; and (6) less than a marked limitation in health and physical well-being.  (R. 18).  The ALJ considered Plaintiff's hearing testimony, medical treatment records, and the opinion of Dr. Parmelee, and found that his medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the allegations concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence.  (R. 19).  Accordingly, the ALJ found that, prior to age eighteen, Plaintiff did not have an impairment or combination of impairments that resulted in marked limitations in two domains of functioning or extreme limitation in one domain of functioning.  (R. 22).

### 2.    Adult Listings

The ALJ next considered whether, after attaining age eighteen, Plaintiff's impairments met or medically equaled the criteria for Listings 1.03 (Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), 1.04 (Disorders of the spine), 1.05 (Amputation due to any cause), and 1.08 (Soft tissue injury, e.g., burns).  (R. 22).  Listing 1.05 provides in relevant part:

> B.  One or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00 B2b, which have lasted or are expected to last for at least 12 months.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.05(B).  The ALJ found that any ambulatory dysfunction would not be attributable to stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as Plaintiff currently uses two prosthetic devices.  (R. 22).  The

ALJ also found that listings 1.03, 1.04, and 1.08 were not met because Plaintiff's ambulatory dysfunction was not related to reconstructive surgery of a major weight-bearing joint or Plaintiff's thoracic spinal issues, and because the treatment of Plaintiff's burns has not been directed towards the salvage or restoration of a major function.  *Id.*

### 3.     Plaintiff's Argument

Plaintiff does not challenge the ALJ's findings that his ambulatory dysfunction was not related to reconstructive surgery of a major weight-bearing joint or his thoracic spinal issues, and that the treatment of Plaintiff's burns has not been directed towards the salvage or restoration of a major function—i.e., he does not challenge the ALJ's conclusions as to listings 101.03/1.03, 101.04/1.04, or 101.08/1.08.  Rather, Plaintiff asserts that he meets the listings simply because he has demonstrated an inability to ambulate effectively.  (Pl.'s Br., ECF No. 10, at 5–8).  In support of this argument, Plaintiff points to medical evidence from his treating physician Dr. Perelshteyn, who found Plaintiff unable to walk a block at a reasonable pace on an uneven surface.  (R. 7, 2529).  Plaintiff also cites to 20 C.F.R. pt. 404, subpt. P, app. 1, § 101.00B2b and § 1.00B2b and claims that he is disabled under these "listings."  *Id.* at 5.

First, this Court clarifies that § 101.00B2b and § 1.00B2b are not listings as the term is defined by the Social Security Regulations.  Rather, these sections merely define the term "inability to ambulate effectively" as it pertains to the minor and adult listing analyses.[5]  *See, e.g.*

---

[5]  § 101.00B2b provides in relevant part:

> (1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment that interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 101.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both

upper extremities. (Listing 101.05C is an exception to this general definition because the child has the use of only one upper extremity due to amputation of a hand.)

. . .

(3) *How we assess inability to ambulate effectively for older children.* Older children, who would be expected to be able to walk when compared to other children the same age who do not have impairments, must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out age-appropriate activities. They must have the ability to travel age-appropriately without extraordinary assistance to and from school or a place of employment. Therefore, examples of ineffective ambulation for older children include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out age-appropriate school activities independently, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about the child's home or a short distance at school without the use of assistive devices does not, in and of itself, constitute effective ambulation.

§ 1.00B2b provides:

(1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) *To ambulate effectively,* individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces,

*Garrett v. Comm'r of Soc. Sec.*, 274 Fed.Appx. 159, 162–63 (3d Cir. 2008) (using § 1.00B2b as a definition of ineffective ambulation to decide whether plaintiff met Listing 1.04); *Morrison v. Astrue*, 355 Fed.Appx. 599, 601 (3d Cir. 2009) (finding plaintiff who did not satisfy definition of ineffective ambulation in § 1.00B2b did not satisfy Listing 1.04; *Halloran v. Berryhill*, 290 F.Supp.3d 307, 317–18 (M.D. Pa. 2017) (explaining that Listing 1.04 requires that plaintiff satisfy the definition of ineffective ambulation provided in § 1.00B2b). Therefore, Plaintiff's claim that he is disabled under these "listings" and that the ALJ erred by failing to consider them is misguided.

To the extent Plaintiff argues his ambulatory dysfunction meets the actual pertinent listings, § 101.05 and § 1.05, these listings require more than an inability to ambulate ineffectively; they also require "stump complications resulting in medical inability to use a prosthetic device." 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 1.05(B) & 101.05(B). The ALJ found that any ambulatory dysfunction Plaintiff suffers cannot be attributed to such stump complications because Plaintiff uses two prosthetic devices. (R. 17, 22). Indeed, Plaintiff testified to his use of these devices, and the medical record contains many references to his ability to ambulate well using his prostheses. (R. 40, 2210, 2241, 2190–91, 2188). Additionally, there is no evidence in the record that Plaintiff has suffered stump complications, and Dr. Woll found specifically that Plaintiff's stumps had healed well. (R. 2514). Because of this, Plaintiff

---

the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

has not met *all* the requirements of the listing.  *See Sullivan*, 493 U.S. at 530 (claimant who meets only some of the listing requirements, "no matter how severely, does not qualify").

Nonetheless, Plaintiff argues that the ALJ should have considered his inability to ambulate effectively as part of her listings analysis.  In support of this argument, Plaintiff cites *Rosado ex rel. J.R.A. v. Colvin*, No. 14-cv-602, 2016 WL 845277 (N.D. Okla. 2016), where the court found that an ALJ had erred by failing to properly consider the claimant's ability to ambulate.  However, not only is *Rosado* an unreported case from outside this circuit, but it is also distinguishable from the facts present here.  In *Rosado*, the ALJ erred specifically by finding that the plaintiff could ambulate without a handheld assistive device under the general definition in paragraph (1) of § 101.00B2b, while failing to address the additional criteria in paragraph (3). *Rosado*, 2016 WL 845277, at *4.  Additionally, the court found the ALJ's discussion of the plaintiff's ability to ambulate during his step four analysis insufficient.  *Id.* at *5–6.  Importantly, in *Rosado* the plaintiff met all the other requirements of the listing.  *Id.* at *5.

Here, the ALJ did not explicitly discuss Plaintiff's ambulatory abilities in her listings analysis because she found Plaintiff did not meet the listings on other grounds, namely through a lack of stump complications resulting in a medical inability to use prosthetics.  Notably, she did not find that Plaintiff *is* able to ambulate effectively, and in fact her decision assumes that Plaintiff cannot do so, stating that "*any ambulatory dysfunction* would not be attributable to stump complications …"  (R. 17 (emphasis added)).  Further, the ALJ thoroughly discussed Plaintiff's ambulatory abilities throughout the rest of her decision.  *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (finding the ALJ's explanation at step three sufficient where the decision "read as a whole" illustrated that the ALJ considered the appropriate factors).  The ALJ noted that Plaintiff is able to walk for about ten minutes at a time and for up to thirty minutes on

22

flat surfaces with rests; that after ten to fifteen minutes of walking he experiences pain and his

legs shake; that he does not use a crutch or cane but sometimes uses a scooter or wheelchair; that

he attended cyber school and participated in higher level activities and recreational sports; and

that he has an antalgic gait, inability to ambulate for long periods, and reduced stamina.  (R. 19–

21, 25).  The ALJ also found Dr. Perelshteyn's opinion noting that Plaintiff could not walk a

block at a reasonable pace on rough or uneven surfaces to be persuasive in her step four analysis.

(R. 24–25).  Unlike in *Rosado*, the ALJ in this case thoroughly explained her findings regarding

Plaintiff's ambulatory dysfunction, and nonetheless concluded that Plaintiff did not satisfy the

listing's other requirements.

Therefore, I find that substantial evidence supports the ALJ's listing determinations, and

remand on this ground will be denied.

### B.    Medical Opinion Evidence

Second, Plaintiff argues that the ALJ failed to assign the appropriate weight to the

opinion of Plaintiff's treating physician, Dr. Perelshteyn.  (Pl.'s Br., ECF No. 10, at 10).

Plaintiff asserts that the ALJ assigned more weight to the opinion of the state agency reviewing

physician, Dr. Parmalee.  *Id.* at 11–12.  Plaintiff also argues that the ALJ failed to address Dr.

Perelshteyn's findings that Plaintiff had difficulty ambulating.  *Id.*

On March 27, 2017, the Social Security Administration published revisions to its rules

regarding the evaluation of medical evidence.  *See* Revisions to Rules Regarding the Evaluation

of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed.

Reg. 15,132 (Mar. 27, 2017)).  Plaintiff filed his application for benefits on July 22, 2018,

meaning that the new regulations apply to his claim.  Under the new regulations, the ALJ will

not give specific evidentiary weight, including controlling weight, to any medical opinions, even

from a claimant's treating physician(s). *Id.* at § 404.1520c(a). Rather, the ALJ must evaluate the persuasiveness of the source using a number of factors, the most important of which being supportability and consistency. *Id.* at (b)(2). An ALJ may, but is not required to, explain how he considered the source's relationship with the claimant, whether the source is a specialist, and/or other factors. *Id.* at (c)(3)-(5).

After evaluating the persuasiveness of the medical opinions, the ALJ determines the claimant's RFC. An RFC assessment determines "what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of [her] medically determinable impairment(s)." SSR 83-10, 1983 WL 31251, at *7. The ALJ must include all credibly established limitations in the RFC. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).

Here, the ALJ determined Plaintiff's RFC since attaining age eighteen as:

> [T]he residual functional capacity to perform a range of sedentary work as defined in 20 CFR 416.967(a) with the following limitations: no use of foot controls; frequently able to reach, handle, finger, feel and push/pull with the non-dominant left upper extremity; no climbing of ladders, ropes, or scaffolds, crawling, kneeling, or crouching, and no balancing on narrow, slippery, or erratically moving surfaces; occasional ability to perform all other postural maneuvers; can stand/walk up to two (2) hours/day but only up to 10 minutes at one time; no exposure to vibration or hazards such as unprotected heights or dangerous machinery; and can tolerate occasional exposure to humidity or extreme temperatures.

(R. 22). In forming her RFC, the ALJ considered the medical records from Shriners Hospital and the opinions of consultative orthopedic examiner Dr. Andrea Woll, state reviewing physician Dr. Toni Jo Parmelee, and Plaintiff's primary care physician Dr. Vladimir Perelshteyn. (R. 23–25). The ALJ found Dr. Woll's opinion to be generally unpersuasive, explaining that it was inconsistent with the medical records and overestimated Plaintiff's capabilities. (R. 24–25). The

ALJ found Dr. Parmelee's opinion to be somewhat persuasive relative specifically to Plaintiff's capacity for standing/walking, postural activities, manipulative activities with the left upper extremity, and environmental restrictions, in which regard her opinion was consistent with Dr. Perelshteyn's.  (R. 24).  Finally, the ALJ found Dr. Perelshteyn's opinion to be persuasive and generally well supported by the medical evidence of record.  *Id.*  The ALJ also stated that she had incorporated Dr. Perelshteyn's opinions regarding Plaintiff's exertional level, ability to stand/walk in an eight-hour workday, capacity for postural activities, ability to perform manipulative activities with the left upper extremity, and recommended environmental restrictions into her RFC, along with additional restrictions as to balancing and ability to stand/walk at one time.  *Id.*

While Plaintiff argues that the ALJ ignored Dr. Perelshteyn's opinion in favor of that of Dr. Parmelee, the ALJ actually gave *more* weight to Dr. Perelshteyn's opinion than Dr. Parmelee's.  (R. 24).  In fact, the ALJ's RFC determination was entirely consistent with the limitations imposed in Dr. Perelshteyn's opinion.  (R. 24, 2524–29).  Dr. Perelshteyn found that Plaintiff could sit for up to eight hours without interruption; stand or walk for up to ten or fifteen minutes at a time; ambulate without the use of a cane; frequently reach, handle, finger, or push/pull with his left hand; never operate foot controls with either his left or right foot; frequently stoop, occasionally climb stairs, balance, or kneel, and never climb ladders or scaffolds, crouch, or crawl; could be continuously exposed to dust, odors, and other pulmonary irritants; could occasionally operate a motor vehicle and be exposed to humidity, extreme cold, and extreme heat; and could never be exposed to unprotected heights, moving mechanical parts, or vibrations.  (R. 2524–28).  Accordingly, the ALJ limited Plaintiff to sedentary work with additional limitations: no use of foot controls; frequent reaching, handling etc. with the left hand;

no climbing of ladders, ropes, or scaffolds; no crawling, kneeling or crouching; occasional ability to perform all postural maneuvers; standing or walking for only up to ten minutes at one time; no exposure to vibration, unprotected heights, or dangerous machinery; and occasional exposure to humidity or extreme temperatures.  (R. 22).  Because the ALJ fully credited Dr. Perelshteyn's opinion and incorporated it into her RFC, Plaintiff's argument that she did not afford it the proper weight is without merit.

A close reading of Plaintiff's Brief and Reply suggests that Plaintiff actually takes issue with the fact that the ALJ did not mention Dr. Perelshteyn's medical opinion during her *listings* analysis.  In his Brief, Plaintiff argues that the ALJ ignored Dr. Perelshteyn's opinion in favor of Dr. Parmelee's, references § 1.00B2b's definition of ineffective ambulation, and points to Dr. Perelshteyn's finding that Plaintiff could not walk a block at a reasonable pace on rough and uneven surfaces.  (Pl.'s Br., ECF No. 10, at 12–13).  Plaintiff's Reply similarly focuses on the listings issue of whether Plaintiff is able to ambulate effectively, states that the ALJ erred because she "only gave Dr. Perelshteyn's RFC persuasive weight with regards to [Plaintiff's] work capacity," and asks that the matter be remanded for "proper consideration of all relevant listings with great weight being given to the … evaluation of Dr. Perelshteyn's RFC."  (Reply, ECF No. 12, at 6).

Plaintiff is correct that, during her analysis of whether Plaintiff functionally equaled the listings, the ALJ only discussed Dr. Parmelee's opinion and did not refer to Dr. Perelshteyn's findings.  (R. 21).  However, Dr. Perelshteyn's opinion would not have been relevant to this specific section of the ALJ's decision because it was authored *after* Plaintiff attained age eighteen, and the issue of whether Plaintiff functionally equaled the listings is only relevant to the *minor* listings analysis.  *See* 20 C.F.R. 416.924(d) & 416.926(a).  In fact, Dr. Parmelee's

26

opinion is the only medical opinion in the record evaluating Plaintiff's limitations before age eighteen; therefore, the ALJ properly considered only Dr. Parmelee's opinion in her analysis of whether Plaintiff functionally equaled the listings as a minor.  Additionally, as discussed above, the ALJ properly explained her finding that Plaintiff did not meet the adult listings because he did not have stump complications resulting in an inability to use prosthetics, and further supported her findings regarding his ambulatory issues with substantial evidence in step four of her decision.  *See supra* Part V.A.3.; *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). Because of this, Plaintiff's argument that the ALJ erred by failing to credit Dr. Perelshteyn's opinion that Plaintiff could not ambulate effectively is without merit.

Accordingly, I find that the ALJ's RFC determination and evaluation of the medical opinions are supported by substantial evidence, and remand on this ground will be denied.

### C.    VE Testimony

Finally, Plaintiff argues that the ALJ erred by finding that there was work available to him in substantial numbers in the national economy.  (Pl.'s Br., ECF No. 10, at 9).  Plaintiff argues that the ALJ should not have credited the testimony of the vocational expert (VE) that Plaintiff could work as an answering service operator, pharmaceutical egg processor, or identification clerk despite his ambulatory limitations.  *Id.*  Plaintiff also argues that the ALJ should have credited the VE's testimony that an employee who could only tolerate a six-hour workday sitting, standing, or walking would not be compatible with competitive employment. *Id.*

In steps four and five of a disability determination, "a [VE] . . . may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of

the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 416.960(b)(2).  The purpose of posing a hypothetical is to determine whether a claimant has the RFC to perform either the claimant's previous work or any work that exists in the national economy.  *Ramirez*, 372 F.3d at 549.  The ALJ's hypothetical "must accurately convey to the [VE] all of a claimant's credibly established limitations" in order to rely upon the VE's testimony as substantial evidence.  *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

Here, the ALJ first posed a hypothetical consistent with her RFC determination to the VE assuming an individual of Plaintiff's age and education with no past work, limited to sedentary work, and with additional limitations that he cannot use foot controls; is limited to frequent reaching, handling, fingering, feeling, and pushing/pulling with the left upper extremity; cannot climb ladders, ropes, or scaffolds; cannot crawl, kneel, or crouch; can occasionally engage in all other postural maneuvers except no balancing on narrow, slippery, or erratically moving surfaces; and can stand and/or walk up to two hours per day in total, but no more than ten minutes at one time.  (R. 50).  Based on this hypothetical, the VE found that Plaintiff could perform the occupations of answering service provider, pharmaceutical egg processor, and identification clerk.  (R. 51).  The ALJ then asked the VE if only tolerating a six-hour workday whether sitting, standing, or walking would be compatible with competitive employment, and the VE answered that it would not.  (R. 52).

Plaintiff first argues that the ALJ should not have credited the VE's response to the first hypothetical that he could perform three sedentary jobs in the national economy because his ambulatory limitations are severe enough to meet or medically equal a listing.  (Pl.'s Br., ECF No. 10, at 9).  This argument is unavailing because, as discussed above, the ALJ properly found

that Plaintiff did not meet or medically equal any of the listings; if he had, it would not have been necessary for the ALJ to reach step five.  Additionally, the ALJ properly relied on the VE's testimony because it was not inconsistent with the Dictionary of Occupational Titles (DOT), and because the ALJ included all of Plaintiff's credibly-established limitations in her hypothetical. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  Plaintiff argues that the ALJ should have instead accepted the VE's testimony that a person who could only tolerate a six-hour workday would not be compatible with competitive employment; however, the ALJ ultimately did not find that Plaintiff could only tolerate a six-hour workday.  Her RFC incorporates Dr. Perelshteyn's findings that Plaintiff could sit for up to eight hours a day, walk for two hours total and for ten minutes at a time, and frequently reach, handle, finger, or push/pull with his left hand, making him capable of sedentary work with the additional limitations discussed above.  (R. 22, 2524–29).  Therefore, the ALJ did not pose an improper hypothetical to the VE or err in relying on the VE's corresponding testimony.

Accordingly, the ALJ's step five determination is based on substantial evidence, and remand on this ground will be denied.


## VI.    CONCLUSION

For the reasons set forth above, I find that the ALJ's decision is supported by substantial evidence.  Accordingly, Plaintiff's request for review is **DENIED**.


BY THE COURT:

   /s/ Lynne A. Sitarski                       
LYNNE A. SITARSKI
United States Magistrate Judge